# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7016 | **DATE** | 12/4/2002 |
| **CASE TITLE** | Ryan Beck & Co., Inc. vs. Wilson Campbell, etc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Amended Memorandum Opinion and Order: Ryan Beck's motion for a preliminary injunction is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

DEC 05 2002
date docketed

12/4/2002
date mailed notice

**Document Number**

13

GL
courtroom deputy's initials

U.S. DISTRICT COURT
CLERK

02 DEC -4 PM 4: 27

D 10

Date/time received in central Clerk's Office

GL
mailing deputy initials

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RYAN BECK & CO., INC.             )
                                      )
           Plaintiff,          )
                                        )
           v.               )      Case No. 02 C 7016
                                        )
WILSON CAMPBELL, Individually   )
and as TRUSTEE of the Wilson      )
A. Campbell Rev. Trust           )
                                        )
           Defendant.       )

DOCKETED
DEC - 5 2002

## AMENDED MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Ryan Beck and Company ("Ryan Beck") has filed a motion for a temporary restraining order and preliminary injunction against Defendant Wilson Campbell ("Campbell"), seeking both declaratory and injunctive relief. On October 8, 2002, this Court declined to grant Ryan Beck's TRO on grounds of mootness. We now grant Ryan Beck's motion for a preliminary injunction.

## I. Background

The following facts are taken from the affidavits and other evidence submitted by both parties. We will accept as true a party's affidavits or other evidence when it has not been contradicted or denied by the opposing party's evidence. *See O'Connor v. Bd of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1302 (1980). Defendant Campbell has filed an action with the dispute resolution section of the National Association of Security Dealers ("NASD") naming Reed Badgley, Gruntal & Co., L.L.C. ("Gruntal"), and Plaintiff Ryan Beck as respondents. Campbell filed the

arbitration pursuant to a contract between himself and Gruntal that required all disputes arising out of Campbell's account with Gruntal be resolved by arbitration.

In 1997, Campbell opened an investment account through Reed Badgley, a stock broker who was then employed with Howe Barnes Investment ("Howe"). When, in June of 2000, Badgley was discharged from Howe for inappropriate conduct, and subsequently hired by Gruntal, Campbell transferred his account from Howe to Gruntal. At the time of the transfer, Campbell's account had an asset value of $5,855,752.00. Campbell was retired at the time of the transfer, and planned to use these assets to fund his retirement. Campbell explained as much to Badgley, and indicated to Badgley that his investment objectives were "moderate risk." Rather than adjusting Campbell's investments to reflect this change, Badgley continued to increase the margin balance on the account and changed the portfolio so that 89% of stocks were in the high tech industry. Less than two years after transferring to Gruntal, Campbell's account lost approximately $4,000,000.00. Campbell withdrew his assets from his account by February 2002.

Like Campbell, Gruntal was facing serious problems of its own. Prior to September 11, 2001, Gruntal was headquartered at One Liberty Plaza in New York. Due to the events of September 11, Gruntal was forced to abandon its severely damaged headquarters and suffered serious financial difficulties. Gruntal's principal owner, Zurich Insurance Company/Zurich Global Assets L.L.C. ("Zurich") attempted for quite some time to sell Gruntal or certain of Gruntal's assets, including its broker-dealer business. On April 26, 2002, Gruntal entered into both an Asset Purchase Agreement and an Assumption Agreement with Ryan Beck, a stock brokerage company and wholly owned subsidiary of BankAtlantic Bancorp, Inc. ("BankAtlantic"). Under the Assumption Agreement, Ryan Beck acquired certain identified assets and liabilities of Gruntal. Specifically, Ryan Beck acquired

all of Gruntal's customer accounts and its retail system.[1]  Although Ryan Beck assumed certain of

Gruntal's liabilities, it expressly did not acquire "liabilities for litigation, arbitrations or other claims

relating to operations [of Gruntal] prior to the Closing Date [4/26/02], whether instituted before or

after the Closing Date."  Plaintiff's Exhibit A, ¶ 1.B.2.  In consideration for Gruntal's retail broker-

dealer operation, Ryan Beck assumed future liabilities for a number of Gruntal's real estate leases

(estimated obligation of $49 million), future employment of over 1,000 former Gruntal employees

(estimated obligation of $90 million), and had to acquire $15 million in capital to upgrade the assets

it acquired from Gruntal.[2]  Although Campbell does not specifically dispute that Ryan Beck assumed

those burdens as a result of the transaction, it continually urges, without offering any supporting

evidence, that Ryan Beck paid no consideration in return for its acquisition of Gruntal's assets.[3]

As a result of the agreement, Gruntal, though it still exists and is responding to demands for

arbitration by its former clients, has a reduced skeletal staff and no longer has a retail stock brokerage

---

[1]In addition, Ryan Beck acquired books and records relating to Customer Accounts, security deposits with respect to the Ryan Beck Locations, the right to use the Gruntal name, trademarks, and intellectual property associated with the business being acquired, forgivable loans made to account executives hired by Ryan Beck under the agreement, the Gruntal & Co., L.L.C. Deferred Compensation Plan, prepaid rent on Ryan Beck locations, the furniture, fixtures, and equipment which were owned by Gruntal, the right to use the compliance and procedure manuals of Gruntal, documents, materials, agreements, and information in possession of Gruntal that related to the acquired assets and assumed liabilities.

[2]Ryan Beck contends that it also paid $6 million for the assets it acquired, but has not supported this assertion with evidence.  We will therefore not include this contention in the facts assumed to be true for the purpose of deciding this motion.

[3] To support its contention that Ryan Beck did not give consideration, Campbell points us to Exhibit B, page 2 of its response memorandum.  This document, however, contains no reference at all to the asset purchase agreement or any lack of consideration.  We therefore do not accept as true Campbell's allegation that Ryan Beck paid no consideration in return for Gruntal's assets.

business. Most of Gruntal's former account executives accepted employment with Ryan Beck, and Gruntal's clients were directly transferred from Gruntal to Ryan Beck, although they had the option of transferring from Ryan Beck after the acquisition. Indeed, after the agreement, visitors to Gruntal's website were automatically redirected to Ryan Beck's website where they were informed that "the integration of Ryan, Beck and Co. and the former branch offices of Gruntal & Co. is complete...Please contact your Financial Consultant to learn more about what we can do for you." Def. Ex. H. Campbell has never been a client of Ryan Beck. Campbell withdrew his assets from his accounts with Gruntal by February 2002, months before Ryan Beck acquired Gruntal's customer accounts. No contracts or agreements exist between Campbell and Ryan Beck.

Campbell does not dispute that the transaction between Ryan Beck and Gruntal was an acquisition, not a merger.[4] Furthermore, Ryan Beck did not acquire any stock or equity in Gruntal, and Ryan Beck did not give any stock or ownership interest in it to Gruntal or any officer or director of Gruntal. Ryan Beck's management team, including its CEO, CFO, President, and Board of Directors, remained the same throughout and after the acquisition. No member of the senior management team at Gruntal became a member of the senior management at Ryan Beck.

In response to Campbell's Statement of Claim, Ryan Beck has filed the instant action seeking an injunction barring Campbell from proceeding with his arbitration as to Ryan Beck.

## II. Analysis

A plaintiff seeking a preliminary injunction must show "(1) a likelihood of success on the merits, (2) irreparable harm if the preliminary injunction is denied, and (3) the inadequacy of any

---

[4]Campbell does urge this Court, however, to find that the transaction was a de facto merger.

4

remedy at law." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). Once this threshold showing is made, the Court must balance (4) the harm to the plaintiff if the preliminary injunction were wrongfully denied against the harm to the defendants if the injunction were wrongfully granted, and (5) the public interest. *See id.*

## A. Ryan Beck is Likely to Succeed on the Merits

There are two methods by which Ryan Beck could be compelled to arbitrate Campbell's claim. First, Ryan Beck would be obliged to arbitrate if it directly entered into an arbitration agreement with Campbell. Second, because Gruntal entered into an arbitration agreement with Campbell, Ryan Beck may be compelled to arbitrate if it is found to be Gruntal's successor in interest. Under either of these approaches Ryan Beck is likely to show that its "chances for success are better than negligible." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984).[5]

Ryan Beck is likely to prove that it did not agree to arbitrate its disputes with Campbell. In deciding arbitrability, this Court must bear in mind that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Navigation Co.*, 80 S.Ct. 1347, 1353 (1960). We cannot assume Ryan Beck has agreed to arbitrate "unless there is *clear and unmistakable* evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 115 S.Ct. 1920, 1924 (1995) (emphasis added). We are convinced, at this point, that Ryan Beck never entered into any agreement to arbitrate with Campbell.

---

[5] This Court, and not an arbitration panel, is the correct institution to determine whether Ryan Beck is bound to arbitrate. *See AT&T Technologies, Inc. v. Communications Workers of America*, 106 S.Ct. 1415, 1417 (1986) ("the issue of arbitrability is for the courts," rather than arbitrators to decide).

Campbell withdrew all the assets in his accounts at Gruntal by February 2002, months before Ryan Beck acquired the customer accounts of Gruntal. Campbell was never a client of Ryan Beck. No contracts were executed between Campbell and Ryan Beck. Based on this evidence, we find that Ryan Beck is likely to prevail in proving that it did not enter into an agreement to arbitrate disputes with Campbell.

Even absent an express agreement between Ryan Beck and Campbell, Ryan Beck may be forced to arbitrate Campbell's dispute if it is liable as a successor in interest to Gruntal. As a general rule, "a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation." *Vernon*, 688 N.E.2d at 344-45.[6] Indeed, it is "not easy for a corporation to be considered a 'successor-in-interest' under common law such that it can be held liable for the acts of its predecessor." *Ghouth v. Conticommodity Services, Inc.*, 642 F. Supp. 1325, 1328 (N.D. Ill. 1986). There are, however, four exceptions to the general rule of successor corporate nonliability: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; (4) or where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations. *Vernon*, 688 N.E.2d at 345; *see also Sweatland v. Park Corp.*, 181 A.D.2d 243, 245 (NY App. Div. 1992). Despite Campbell's

_____

[6]Campbell urges this Court to apply substantive New York law to this diversity action. The central issue presented in this case is whether Ryan Beck fits within one of the four exceptions to the general rule that corporate successors are not responsible for the liabilities of their predecessors. We find that the laws of New York and Illinois do not conflict with regard to this substantive issue. Indeed "[t]hese exceptions are equally recognized in most American jurisdictions." *Vernon v. Schuster*, 688 N.E.2d 1172, 1176 (Ill. 1997). We therefore need not resolve the choice of law question. *See Barron v. Ford Motor Co. of Canada*, 965 F.2d 195, 198 (7th Cir. 1992) ("before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there is actually a difference between the relevant laws of the different states").

6

contention that Ryan Beck is liable under each of these exceptions, we find that Ryan Beck is likely to succeed in proving that it is not liable as Gruntal's successor in interest.

### 1. Express or Implied Assumption of Liability

In the Assumption Agreement executed by Ryan Beck and Gruntal, Ryan Beck assumed liability for certain enumerated obligations and disclaimed others. In particular, the statement provides that "[p]urchaser does not assume, and shall have no Liability...for...any liabilities for litigation, arbitrations, or other claims relating to or arising out of Sellers' operations prior to the Closing Date." Plaintiff Ex. 2., Assumption and Implementation Agreement, ¶ 3.

Campbell does not dispute that Ryan Beck expressly disclaimed liability for the instant action. Rather, Campbell urges that Ryan Beck, through its assumption of other of Gruntal's liabilities and its communication with Gruntal's clients, impliedly assumed liability. In support of this argument, Campbell relies on *Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834, a case that is distinguishable from the present action. Under *Ladjevardian*, the party asserting liability must present evidence sufficient to "indicate an intention on the part of the buyer to pay the debts of the seller." *Id.* at 839. The *Ladjevardian* court relied on letters from the purchasing corporation to the seller's clients that indicated the purchaser's intent to "assume all benefits and burdens of its predecessor in the continuation of business." *Id.* at 840. Campbell tries to liken the facts of *Ladjevardian* to letters sent by Ryan Beck to Gruntal's customers in an effort to establish that Ryan Beck impliedly assumed the liabilities of Gruntal vis-a-vis Gruntal's customers prior to April 26, 2002.

Campbell overlooks one important distinction between the present case and *Ladjevardian*: the purchasing corporation in *Ladjevardian* did not expressly disclaim certain liabilities as did Ryan Beck. "In the face of contractual language that expressly disclaims liability, we cannot find that there was an implied assumption of liability, and we need not consider the argument that plaintiff's conduct manifested an intent to assume such liability." *City Management Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 256 (6th Cir. 1994) (purchasing corporation not responsible for liabilities connected with all of seller's property when asset purchase agreement limited purchaser's liability to one specific property only); *see also Myers v. Putzmeister, Inc.*, 596 N.E.2d 754, 756 (Ill. App. Ct. 1992) (purchasing company not liable for obligations of the predecessor prior to the closing date of the acquisition where asset purchase agreement expressly disclaimed liability despite plaintiff's evidence that purchasing corporation took on some of these obligations); *Ruiz v. Weiler & Co., Inc.*, 860 F. Supp. 602, 605 (N.D. Ill. 1994) (express disclaimer of liability in asset purchase agreement "militates against a finding of assumption of liability"); *City of Aurora v. American LaFrance Corp.*, 1985 WL 3141, *4 (N.D. Ill. 1985) (purchasing corporation "expressly assumed limited enumerated liabilities of its predecessor and expressly excluded the assumption of liabilities not enumerated, thereby avoiding any implied assumption of liability"). In light of Ryan Beck's explicit disclaimer of liability, we find it is likely that Ryan Beck will succeed in proving that it did not impliedly assume liability for litigation or arbitrations relating to Gruntal's operations prior to April 26, 2002.

### 2. De Facto Merger

Campbell argues that the transaction between Ryan Beck and Gruntal was in actuality a *de facto* merger under the guise of an asset purchase agreement. "For a *de facto* merger to occur, there

must be continuity of the successor and predecessor corporation as evidenced by: (1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (4) a continuity of management, personnel, physical location, assets, and general business operation." *Lumbard v. Maglia*, 621 F. Supp. 1529, 1535 (S.D.N.Y. 1985). Using these factors as "indicators that tend to show de facto merger," *Kessenich v. Raynor*, 120 F. Supp.2d 242, 255 (E.D.N.Y. 2000), rather than as a rigid litmus test, we hold that the transaction between Ryan Beck and Gruntal was likely not a *de factor* merger.

Campbell concedes that there is no continuity of ownership between Gruntal and Ryan Beck. With regard to the second factor, although Gruntal transferred its entire retail brokerage business to Ryan Beck in April 26, 2002, it has yet to dissolve and is responding to Campbell's arbitration. Although Campbell has offered evidence that Gruntal is currently operating with a "skeletal staff," it has not produced any evidence indicating that Gruntal is a mere shell or that it has no assets. Def. Ex D. Thus, this factor weighs against a finding of *de facto* merger. The third factor, however, weighs in favor of a *de facto* merger. Ryan Beck agreed to assume obligations essential for the continuation of the business, such as leases and real estate contracts, contracts with certain vendors, products related contracts and software licenses, and employment of hundreds of former Gruntal employees. As to the fourth factor, the joint letter from Gruntal and Ryan Beck to their customers demonstrates that there was continuity of some personnel, assets, and general business operations. There was not, however, continuity of management personnel. Indeed, the CEO, President, CFO, and Board of Directors have maintained their positions throughout the transaction. In light of the

lack of continuity of ownership or management between Gruntal and Ryan Beck we hold that Ryan

Beck has carried its burden of establishing that the transaction was likely not a *de facto* merger.

### 3. Mere Continuation

Ryan Beck is likely not a mere continuation of Gruntal. "The mere continuation exception

allows recovery when the purchasing corporation is substantially the same as the selling

corporation." *North Shore Gas Co. v. Salomon, Inc.*, 152 F.3d 642, 654 (7th Cir. 1998). The cental

inquiry is whether the "purchaser continues the *corporate entity* of the seller, not so much on

whether the purchaser continues the *business operations* of the seller." *Id.* (emphasis in original).

Three factors are relevant in determining whether a purchaser is a mere continuation of the seller.

First, we must consider whether "the purchasing corporation maintains the same or similar

management and ownership, but merely 'wears different clothes'." *Vernon*, 688 N.E.2d at 1176; *see*

*also Ladjevardian*, 431 F. Supp. at 839. As shown above, there is no continuity of management or

ownership. Ryan Beck has existed as a stock brokerage firm for 58 years, its management and

Board of Directors remained intact throughout and after the acquisition of Gruntal's brokerage

business. Second, we determine whether there existed "only one corporation at the completion of

the transfer." *Id.* Here, the transaction did not result in the dissolution of Gruntal, which is still in

business today. Third, we look at the consideration paid by the purchaser in return for the assets.

Despite Campbell's repeated unsupported assertions that Ryan Beck did not pay any consideration

for Gruntal's assets, Ryan Beck has pointed to evidence of consideration, including its assumption

of approximately $140 million of Gruntal's obligations. We therefore conclude that Ryan Beck is

likely to succeed in establishing that it is not a mere continuation of Gruntal.

### 4. Fraud

Campbell maintains that the transaction between Ryan Beck and Gruntal falls within the fourth exception to corporate successor nonliability: that the agreement was entered into for the fraudulent purpose of escaping liability. Campbell suggests that the "huge profits realized by Ryan Beck and its parent company, BankAtlantic, suggests fraud." We disagree. Campbell has not pointed to any evidence of material misrepresentations by Ryan Beck. Conversely, Ryan Beck had offered evidence explaining the why this "huge profit" does not indicate fraud: most of the $24 million realized by Ryan Beck as a result of the acquisition was not a profit but gain, and is comprised of forgivable loans to brokers to came to Ryan Beck from Gruntal. We therefore find no evidence that the transaction between Ryan Beck and Gruntal was tainted with fraud.

For the foregoing reasons we hold that Ryan Beck will likely succeed in proving that the transaction between itself and Gruntal does not fit within any of the four exceptions to the general rule that a purchaser is not liable for the debts or liabilities of the transferor corporation.

### B. Ryan Beck Will Suffer Irreparable Harm and Has No Adequate Remedy At Law

We also find that Ryan Beck will suffer irreparable harm if the preliminary injunction is denied and it is forced to continue with an arbitration to which it did not contractually submit itself. *See Maryland Casualty Co. v. Realty Advisory Board*, 107 F.3d 979, 985 (2nd 1997) (finding that party "would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable"). In addition, we find that Ryan Beck has no adequate remedy at law.

## C. Balancing Weighs in Favor of Granting the Injunction

Having found that Ryan Beck satisfied its initial threshold showing, the Court must now balance the harm to Ryan Beck if the preliminary injunction were wrongfully denied against the harm to Campbell if the injunction were wrongfully granted, and the public interest. The potential harm to Campbell if the injunction is wrongfully granted, while notable, does not outweigh the harm to Ryan Beck if it is forced to defend itself in an arbitration to which it did not contractually agree. If Ryan Beck is ultimately found to be liable as a successor in interest to Gruntal, Campbell can then proceed with the arbitration armed with this information. By contrast, both Campbell and Ryan Beck will be injured if we allow this arbitration to go forward despite the fact that any award obtained will likely be unenforceable. We believe the public interest lies in the most economical and efficient disposition of this dispute. In light of Ryan Beck's high likelihood of success, the public would best be served by the granting of this injunction.

## III. Conclusion

For the foregoing reasons Ryan Beck's motion a preliminary injunction is granted. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated: _12/4/02_