# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7016 | **DATE** | 10/2/2003 |
| **CASE TITLE** | Ryan Beck & Co., Inc. vs. Wilson Campbell, etc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Ryan Beck's motion for summary judgment (42-1) is granted. Pursuant to Fed.R.Civ.P. 65, it is therefore ordered that the preliminary injunction issued on 11/26/02, be made permanent. The status hearing set for 10/2/03 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | OCT 02 2003 date docketed | |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 10/1/2003 date mailed notice | |
| GL courtroom deputy's initials | | U.S. DISTRICT COURT CLERK 03 OCT -2 PM 9:03 Date/time received in central Clerk's Office | GL mailing deputy initials |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RYAN BECK & CO., INC. ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> WILSON CAMPBELL, Individually ) <br> and as TRUSTEE of the Wilson ) <br> A. Campbell Rev. Trust ) <br> ) <br> Defendant. ) | Case No. 02 C 7016 |

**DOCKETED**
OCT 2 2003

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

In August of 2002, Defendant Wilson Campbell ("Campbell") filed an arbitration claim with the dispute resolution section of the National Association of Security Dealers ("NASD") naming, *inter alia*, Ryan Beck & Co., Inc. ("Ryan Beck") as a respondent. Ryan Beck then filed this diversity action against Campbell on October 1, 2002, seeking both declaratory and injunctive relief. After initially denying Ryan Beck's request for a temporary restraining order, on November 26, 2002, we issued an opinion and order granting Ryan Beck's motion for a preliminary injunction, concluding that Ryan Beck would likely prove that it was not the successor in interest to Gruntal & Co., L.L.C. ("Gruntal") and therefore, was not obliged to arbitrate Campbell's dispute. Now before the court is Ryan Beck's motion for summary judgment requesting a declaratory judgment that Ryan Beck is not a successor in interest to Gruntal. Ryan Beck also seeks a permanent injunction enjoining Campbell from continuing his arbitration claim against Ryan Beck. For the reasons set forth below, this Court grants Ryan Beck's motion for summary judgment.

## BACKGROUND[1]

In 1997, Campbell opened an investment account through Reed Bagley, a stock broker employed by Howe Barnes Investments. When Bagley was discharged from Howe Barnes Investments in June, 2000, for inappropriate conduct and subsequently hired by Gruntal, Campbell transferred his account to Gruntal. *See* Campbell's Exhibit X ("Campbell Exh.") at 1. Upon becoming a client of Gruntal, Campbell entered into a form contract with Gruntal which included a broadly-worded arbitration provision that provided that disputes that arose between Campbell and Gruntal relating to his account would be settled by arbitration and would be binding on all successors of the parties. *See* Campbell Exh. P. Less than two years after transferring his account to Gruntal, Campbell's account had lost approximately $4,000,000.00. Campbell Exh. X at 4. Campbell subsequently closed his account at Gruntal and withdrew all of his assets by February, 2002.

During this time, Gruntal was facing serious financial problems. Gruntal was a full service broker-dealer with memberships in the New York Stock Exchange and NASD. Gruntal was a wholly owned subsidiary of Gruntal Financial, L.L.C., and Zurich Insurance Company ("Zurich") was the holder of its preferred stock. Even prior to September 11, 2001, Gruntal had been experiencing financial difficulties and was shedding various lines of its business. As a result, Zurich had attempted to sell all or part of Gruntal. In August, 2001, Zurich agreed to sell certain net assets of Gruntal to another company. The formal agreement was to be signed on September 14, 2001. Due to the events of September 11, Gruntal's headquarters at One Liberty Plaza in New York were severely damaged, and its ability to compete in the financial services market was severely impaired. By October, 2001, Gruntal

---

[1] The following facts, unless otherwise noted, are culled from the parties' Local Rule 56.1 Statements of Material Facts.

had closed its investment banking activities and reduced its staff. The offer for Gruntal was withdrawn, citing "materially adverse" changes. Gruntal continued to seek a buyer.

In late 2001, several companies, including Ryan Beck, indicated interest in acquiring Gruntal or some of its assets. Ryan Beck made a proposal to Zurich in November 1, 2001, but Gruntal accepted an offer from another company. That offer was subsequently withdrawn. Another potential deal for Gruntal unraveled by mid-April, 2002. On April 20, 2002, Ryan Beck and Gruntal entered into an agreement ("Ryan Beck-Gruntal Agreement") whereby Ryan Beck acquired most of the assets of Gruntal, including assets of Gruntal's retail brokerage business. Ryan Beck expressly did not assume certain of Gruntal's liabilities, including "liabilities for litigations, arbitrations or other claims relating to operations prior to the Closing Date." The Ryan Beck-Gruntal Agreement closed on April 26, 2002.

In August 2002, Campbell filed a claim for arbitration against Reed Bagley, Gruntal, and Ryan Beck. Campbell's arbitration claim complains of actions taken by Reed Bagley and Gruntal during the period that Campbell was a customer of Gruntal. Gruntal filed for bankruptcy protection on October 29, 2002.

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(citations omitted). Once the moving party has met this burden of production, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255. However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

The standard for granting permanent injunctive relief is the same as for a preliminary injunction, except that the moving party must in fact succeed on the merits instead of showing a reasonable likelihood of success on the merits. *Plummer v. American Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996). Thus, to obtain a permanent injunction, Ryan Beck must show: (1) actual success on the merits; (2) that it does not have an adequate remedy at law or will suffer irreparable harm without an injunction; (3) the balance of the harms between the parties favors entering the injunction; and (4) entry of the injunction will not harm the public interest. *Chicago Sch. Reform Bd. of Trustees v. Diversified Pharmaceutical Servs., Inc.*, 40 F. Supp.2d 987, 991 (N.D. Ill. 1999).

## II. DUTY TO ARBITRATE

Whether Ryan Beck is bound to arbitrate is an issue for the court to decide. *See AT&T Technologies v. Communications Workers of America*, 475 U.S. 643, 648 (1986). In deciding arbitrability, this court must bear in mind that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). The court may not assume the parties agreed to "arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). In this case, it is undisputed that Campbell

withdrew all the assets in his account at Gruntal by February, 2002, months before Ryan Beck acquired the accounts of Gruntal. Similarly, the conduct of which he complains in his arbitration claim occurred well before the Ryan Beck-Gruntal Agreement was consummated. Campbell admits he never maintained assets or had a brokerage account at Ryan Beck. Indeed, Campbell acknowledges that he has never been a customer of Ryan Beck. Moreover, Campbell has not submitted any evidence that any contract or agreement was executed between Ryan Beck and Campbell. Based on this evidence, we conclude that Ryan Beck did not enter any agreement or contract to arbitrate disputes with Campbell.[2]

## III. SUCCESSOR IN INTEREST LIABILITY

Even absent an express agreement between Ryan Beck and Campbell, Ryan Beck nonetheless may be compelled to arbitrate Campbell's claim if it is found to be liable as a successor in interest to Gruntal.[3] As a general rule, a corporation that merely purchases the assets of another corporation is not liable for the debts and liabilities of the seller. There are, however, four exceptions to the general rule of successor nonliability. The purchaser is liable for the obligations of the seller: (1) where there is an

---

[2] Given Campbell's failure to address this issue in his Memorandum of Law in Opposition to Ryan Beck's Motion for Summary Judgment ("Campbell Opp."), it appears as though he no longer contests this issue.

[3] Campbell contends that the issue of successor liability is an issue of fact that should be resolved by a jury. Most of the cases Campbell cites as authority for this proposition simply state that because genuine issues of material fact existed, denial of the motion for summary judgment was proper. *See* Campbell Opp. at 9, citing *Arachnid v. Valley Recreational Products, Inc.*, 2001 WL 1664052 (N.D. Ill. Dec. 27, 2001); *Steel Company v. Morgan Marshall Industries, Inc.*, 662 N.E.2d 595 (Ill. App. Ct. 1996). Moreover, the other case he cites, *Sweatland v. Park Corp.*, specifically states that the **court** is to analyze and weigh the "impact of a multitude of factors" that relate to successorship. *Sweatland*, 181 A.D.2d 243, 246 (N.Y. App. Div. 1992) (emphasis added). The only case Campbell cited that states otherwise is a 1983 Fourth Circuit ruling on a motion for a directed verdict. *See R.C. McEntire & Co. v. Eastern Foods., Inc.*, 702 F.2d 471, 474 (4th Cir. 1983) (stating that successor liability was question of fact). But, in his memorandum of law in opposition to summary judgment, Campbell himself cites to cases that resolved successor in interest liability at the summary judgment stage. *See, e.g., Menacho v. Adamson United Co.*, 420 F. Supp. 128 (D. N.J. 1976); *Grant-Howard Assocs. v. Gen. Housewares Corp.*, 454 N.Y.S.2d 521 (N.Y. App. Div. 1982), *rev'd on other grounds*, 63 N.Y.2d 291 (N.Y. 1984).

express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger of the purchaser and seller; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is entered into for the fraudulent purpose of escaping liability for the seller's obligations. *See Schumacher v. Richards Shear Co.*, 451 N.E.2d 195, 198 (N.Y. 1983); *Sweatland v. Park Corp.*, 181 A.D.2d 243, 245 (N.Y. App. Div. 1992).[4] In his response to Ryan Beck's motion for summary judgment, Campbell argues that Ryan Beck is the successor in interest to Gruntal pursuant to at least two of the established exceptions to the general rule: that the acquisition was a *de facto* merger and that the transaction was entered into fraudulently.[5]

### A. *De Facto* Merger Exception

Under New York law, the *de facto* merger exception is evidenced by four factors: (1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (4) a continuity of

---

[4] In our July 18, 2003 opinion, we determined that New York law applies to the issue of successor in interest liability. *See Ryan Beck & Co., Inc. v. Campbell*, 2003 WL 21697364, at *1 (N.D. Ill. July 18, 2003).

[5] The other two exceptions do not apply here. Campbell concedes that Ryan Beck expressly declined to assume any liabilities that arose prior to April 26, 2002. Indeed, the agreement between Gruntal and Ryan Beck expressly states that Ryan Beck "will not assume. . . liabilities for litigation, arbitration, or other claims relating to or arising out of [Gruntal's] operations prior to the Closing Date [April 26, 2002], whether instituted before or after the Closing Date." This express disclaimer militates against a determination of an implied assumption of liability. *See, e.g., Beck v. Roper Whitney, Inc.*, 190 F. Supp.2d 524, 534 (W.D.N.Y. 2001) (an express disclaimer of liability "warrants a finding that the first exception for finding successor liability does not apply"). The undisputed facts also demonstrate that Ryan Beck is not a "mere continuation" of Gruntal. As discussed more fully *infra*, there is no identity of management, stock, stockholders, or directors. The management and the Board of Directors of Ryan Beck remained intact throughout and after the acquisition of Gruntal's assets. Ryan Beck did not represent a "new hat" for Gruntal and, as such, does not fall within the "mere continuation" exception. *See Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834, 839 (S.D.N.Y. 1977) ("A continuation envisions a common identity of directors, stockholders and the existence of only one corporation at the completion of the transfer.").

6

management, personnel, physical location, assets, and general business operation. *See Sweatland v. Park Co.*, 181 A.D.2d 243, 246 (N.Y. App. Div. 1992); *Nettis v. Levitt*, 241 F.3d 186, 193-4 (2d Cir. 2001) (applying New York law to successor liability for torts).

### 1. *Continuity of Ownership*

The parties concede that there was no continuity of ownership in the asset purchase agreement executed by Gruntal and Ryan Beck.[6] This concession has been held to be dispositive by some courts applying New York law. *See Cargo Partner AG v. Albatrans Inc.*, 207 F. Supp.2d 86 (S.D.N.Y. 2002) (Batts, J., adopting Report and Recommendation of Eaton, M.J., surveying and analyzing New York precedent and holding that continuity of stockholders is required for a *de facto* merger); *see also Employee Relations Associates, Inc. v. Xperius, Inc.*, 2003 WL 21497197, at *2 (N.Y. Sup. Ct. 2003) (stating,"[n]o New York case of which this court is aware has loosened the *Arnold* standards in a contract case" and finding persuasive *Albatrans'* holding that continuity of ownership should remain a

---

[6] In Campbell's Opposition, in a subsection labeled "continuity of ownership," he provides facts and arguments that relate to what he calls "continuity of management" or the continuity of "personnel, physical locations, assets and general business operations." Campbell Opp. at 15. These arguments are addressed, *infra*, in our discussion of the final factor of the *de facto* merger analysis, "continuity of personnel. . ." The only relevant arguments Campbell now makes regarding "continuity of ownership" is that three equity shareholders in Gruntal were eventually hired by Ryan Beck and given stock options in Ryan Beck (and thus, he argues, have an ownership interest in Ryan Beck). He maintains that this is "evidence sufficient to create a question of fact as to whether continuity of ownership exists." Campbell Opp. at 15. However, in Campbell's Motion for Reconsideration of December 10, 2002, he specifically stated "Campbell does not dispute that there is no continuity of ownership." *See also* Wilson Campbell's Response to Plaintiff's Motion for Preliminary Injunction, at 11 (October 30, 2002) ("All of the elements are present in this case for de facto merger with the exception of continuity of shareholders."). Moreover, in the last three decisions this court has entered, we have reported that the parties conceded there was no continuity of ownership, without protest from Campbell. Campbell admits that Ryan Beck did not acquire any stock or equity of Gruntal and Ryan Beck provided no stock to Gruntal. Moreover, the fact that three former employees of Gruntal now have been offered stock options in Ryan Beck that do not vest until 2006 does not evidence continuity of ownership as defined by the New York courts. *See, e.g., Ladjevardian*, 431 F. Supp. at 839 (describing continuity of ownership as "a continuity of stockholders, accomplished by paying for the acquired corporation with shares of stock").

strict requirement in contract cases, determining that the "plaintiff must here show a question of fact as to ownership as well as the other *Arnold* criteria"); *Ryan Beck v. Faust*, 2003 WL 22047321, at *4 (W.D. Pa. Aug. 6, 2003) (holding that *Albatrans* presents an accurate account of New York law in which continuity of ownership is an indispensable element of the *de facto* merger exception, and thus determining that the Ryan Beck-Gruntal Agreement did not amount to a *de facto* merger). Under this interpretation of New York law, then, this concession by Campbell compels a ruling in favor of Ryan Beck that the *de facto* merger exception does not apply here.

In our July 18, 2003 opinion, however, we held that under New York law, the lack of continuity of ownership does not absolutely bar a finding that Ryan Beck is the successor in interest to Gruntal. *See Ryan Beck & Co., Inc., v. Campbell*, 2003 WL 21697364, at *2 (N.D. Ill. July, 18, 2003), citing *Sweatland v. Park Corp.*, 181 A.D.2d 243, 246 (N.Y. App. Div. 1992) and *Fitzgerald v. Fahnestock*, 286 A.D.2d 573, 574 (N.Y. App. Div. 2001) (not all of the factors are necessary to find a *de facto* merger). A recent district court case involving the Ryan Beck-Gruntal Agreement addressed New York successor in interest law and cited *Sweatland* and *Fitzgerald* favorably. *See Ryan Beck & Co., LLC v. Fakih*, 268 F. Supp.2d 210, 229 (E.D.N.Y. 2003) (staying the arbitration of one of the defendants, but allowing for additional discovery on the issue of successor liability). Although not expressly discussing *Albatrans* or *Arnold*, the New York district court quotes *Freeman v. Complex Computing Co.* for the proposition that each of the factors is relevant, but no one factor's presence or absence is determinative. *Id.* at 230, citing *Freeman*, 931 F. Supp. 1115, 1121 (S.D.N.Y. 1996), *aff'd in part, rev'd and vacated in part on other grounds*, 119 F.3d 1044 (2d Cir. 1997) (finding no *de facto* merger occurred).

But, as we said in our previous decision, even were we to evaluate all of the factors of the *de facto* merger analysis, continuity of ownership is "an extremely important factor and its absence in this case weighs heavily against a finding that Ryan Beck is a successor to Gruntal." *See Campbell*, 2003

WL 21697364, at *3. Indeed, other courts that apparently have evaluated each of the factors have not found a *de facto* merger when continuity of ownership was lacking. *See Albatrans*, 207 F. Supp.2d 86, 104 ("[M]y research discloses no case (in New York or other jurisdictions) in which a court has found a de facto merger without at least some degree of ownership continuity–except in the area of products liability... Outside of those areas, it appears that, in practice, ownership continuity has been essential to the finding of a de facto merger"). However, even if the presence of other factors could outweigh the absence of the "continuity of ownership" factor, they do not in this case.

### 2. *Cessation of ordinary business*

Campbell contends there is considerable evidence that Gruntal ceased ordinary business and dissolved as soon as legally possible following the Ryan Beck-Gruntal Agreement. Although Gruntal initially survived the asset transfer as a distinct entity following the Ryan Beck-Gruntal Agreement, Gruntal no longer operated its brokerage business and began a wind-down of its business. Ryan Beck does not dispute that both parties contemplated the likelihood that this cessation of the brokerage business would occur. Within months of the transaction, all businesses of Gruntal that were not acquired by Ryan Beck were dissolved. By October 29, 2002, approximately six months following the Ryan Beck-Gruntal Agreement, Gruntal filed for bankruptcy. Ryan Beck does not dispute any of these facts evidencing cessation of ordinary business; rather, Ryan Beck contends the absence of other factors merits a finding that no *de facto* merger occurred.

### 3. *Assumption of the liabilities ordinarily necessary for the uninterrupted continuation of business*

The parties agree the Ryan Beck-Gruntal Agreement specifies the liabilities Ryan Beck assumed from Gruntal. According to the agreement, although Ryan Beck expressly did not acquire "liabilities for litigation, arbitrations or other claims relating to operations [of Gruntal] prior to the Closing Date,"

it did assume liabilities with respect to selected vendor contracts; selected leases of real property, furniture, and fixtures; product related contracts; and software licenses, among others. Ryan Beck also acquired the books and records relating to customer accounts, the right to use the Gruntal name, trademarks, and intellectual property associated with the business being acquired.

The assumption of these liabilities indicates that Ryan Beck agreed to assume obligations ordinarily necessary for the continuation of business. Again, the parties agree on all the material facts; where they diverge is whether these facts, in conjunction with the eventual bankruptcy of Gruntal, demonstrate that a *de facto* merger occurred.

### 4. *Continuity of management and general business*

Campbell maintains that there is sufficient evidence of continuity of management, personnel, location, assets and business operations. He offers as support the undisputed facts that one of the executive vice-presidents of Gruntal was hired by Ryan Beck in June, 2002, and the president of the private client group was hired by Ryan Beck to serve as a consultant until the end of 2002. Moreover, three former Gruntal employees were granted stock options in Ryan Beck that vest in 2006. It is also undisputed that Ryan Beck began operating out of all but two of Gruntal's former locations and it used the Gruntal name for a period of time. Ryan Beck also acknowledges that it hired approximately 900 of Gruntal's 1200-1300 employees. Although these facts indicate that there was continuity of some personnel and general business operations, there was no continuity of management or major decision-makers. Following the Ryan Beck-Gruntal Agreement, the CEO and chairman, President, CFO, and entire executive management at Ryan Beck remained the same. There was no change in the membership of the board of directors of Ryan Beck. Finally, no Gruntal officer, director or employee became a member of the executive management of Ryan Beck.

Given all the undisputed facts relevant to the four factors evidencing a *de facto* merger, we find that neither continuity of ownership nor continuity of management are present in this case. A thorough review by the court in *Albratrans* revealed no New York case where an asset purchase that lacked continuity of ownership was determined to be a *de facto* merger. We find no reason to depart from this standard here. Indeed, the policy behind imposing liability on a purchasing corporation under the *de facto* exception is to avoid the injustice that would result if a transaction, "by calling itself an asset sale rather than a merger," allowed shareholders to retain their interest in the transferred assets (by having an ownership interest in the purchaser) while cutting off the claims of creditors. *See Cargo Partner AG v. Albatrans Inc.*, 207 F. Supp.2d 86, 94, 105 (S.D.N.Y. 2002). That is not what occurred here. We thus conclude that the absence of continuity of ownership and lack of continuity in management does not justify a finding of a *de facto* merger in this case, and we will not impose successor liability under this exception to the general rule. *See, e.g., Menacho v. Adamson United Co.*, 420 F. Supp. 128, 133 (D. N.J. 1976) (applying New Jersey law, stating "[e]ven the sale of the corporate business is liability free provided ownership and management have not remained the same").

**B.     Fraud**

The fourth exception to the general rule against successor liability provides that the purchaser of the seller's assets may be liable for claims against the seller when the transaction was "entered into fraudulently to escape such obligations." *Schumacher v. Richards Shear Co.*, 451 N.E.2d 195, 198 (N.Y. 1983). Campbell claims that the Ryan Beck-Gruntal transaction was structured so that Ryan Beck could avoid contingent liabilities. Specifically, Campbell argues there is "substantial evidence of actual intent to hinder, delay or defraud, Gruntal's creditors," which he contends is a violation of § 276 of the New

York Debtor and Creditor Law.[7] The existence of actual intent, Campbell maintains, is generally a question of fact precluding summary judgment. Campbell Opp. at 19, citing *Farmers Prod. Credit Ass'n of Middletown*, 504 N.Y.S.2d 448, 449 (N.Y. App. Div. 1986). While New York courts acknowledge that intent is ordinarily a question of fact which cannot be resolved on a motion for summary judgment, summary judgment is proper if no trier of fact could find that the party acted with actual intent. *See, e.g., Lippe v. Bairnco Corp.*, 249 F. Supp.2d 357 (S.D.N.Y. 2003) (dismissing on summary judgment claims brought under § 276); *U.S. v. Carlin*, 948 F. Supp. 271, 277 (S.D.N.Y. 1996) (setting aside conveyances as fraudulent under § 276 on summary judgment); *see also Beck v. Roper Whitney, Inc.*, 190 F. Supp.2d 524, 535 (W.D.N.Y. 2001) (at summary judgment phase, finding that fraud exception to successor liability did not apply because, other than plaintiffs' general allegations, there was no evidence to suggest that the transaction was entered into with the intent to escape liability); *Krisher v. Monarch Mach. Tool Co.*, 1994 WL 705264, at *3 (N.D.N.Y. 1994) (dismissing the fraud exception in a successor in interest case on summary judgment, explaining that an affidavit offering a legitimate business explanation for the acquisition of assets presented "*prima facie* proof that no fraudulent intent underlay the transaction"). Here, Campbell has provided no direct evidence to demonstrate actual intent to hinder, delay or defraud creditors. The only support he offers for his contention is the deposition of Robert Berson, COO of Ryan Beck, in which Campbell asserts that Berson admits that "the purpose of structuring the deal as an asset purchase was to avoid having to be responsible for the arbitration and customer complaints." Campbell Opp. at 24. Campbell also suggests that Berson testified that he was aware that Gruntal would not be able to pay its creditors. *Id.* First, Berson does not state that he was

---

[7] Section 276 provides that:
Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.
N.Y. Debt. & Cred. Law § 276 (McKinney 2003).

12

aware that Gruntal would not be able to pay its creditors. Moreover, Berson does acknowledge in his deposition testimony that one of the principle reasons for the asset purchase was to avoid Gruntal's liabilities for customer complaints and arbitrations. Campbell Exh. E at 54-55. However, this does not evidence an intent to defraud, hinder or delay creditors; the general rule is that when one company purchases the assets of another corporation, it is not liable for the debts and liabilities of the seller. The disclaimer of litigation arising from events prior to the closing date was simply part of an arms-length transaction between two companies. Campbell provides no evidence that any material misrepresentations were made or deception was involved.

Even considering the circumstantial evidence and drawing all reasonable inferences in favor of Campbell, the record does not contain sufficient evidence from which a trier of fact could find actual fraud. A party asserting a claim under § 276 must prove actual fraud by "clear and convincing evidence." *U.S. v. McCombs*, 30 F. 3d 310, 328 (2d Cir. 1994). Because fraudulent intent is "rarely susceptible to direct proof" it often must be established circumstantially by proof of "badges of fraud" that permit an inference to be drawn that a fraudulent conveyance occurred. *See Lippe v. Bairnco Corp.*, 249 F. Supp.2d 357, 374-5 (S.D.N.Y. 2003). Factors that are considered "badges of fraud" include: "1) gross inadequacy of consideration; 2) a close relationship between transferor and transferee; 3) the transferor's insolvency as a result of the conveyance; 4) a questionable transfer not in the ordinary course of business; 5) secrecy in the transfer; and 6) retention of control of the property by the transferor after the conveyance." *Id.* at 375, citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 (1994); *see also People's Ins. Co. of China v. Indep. Radiator Sales, Inc.*, 1999 WL 144521, at *5 (S.D.N.Y. Mar. 17, 1999) (applying badges of fraud to the "fraud" exception of the successor in interest inquiry). As the court in *Lippe* explained, an absence of these badges of fraud would demonstrate that there was no intent to defraud. *Lippe*, 249 F. Supp.2d at 375.

13

Campbell has come forth with no evidence that there was a prior close relationship among the parties. Though Gruntal did file for bankruptcy six months after the transaction, it is undisputed that because of financial difficulties, Gruntal had already sold off assets throughout 2001-2002, and experienced significant hardships following the events of September 11, 2001. It is undisputed that Gruntal was losing millions of dollars a month in early 2002. Campbell has provided no persuasive evidence that the transaction itself was questionable or not carried out in the ordinary course of business. There is no evidence, and no allegation, that the transfer was secretive, hasty or that fictitious or dummy parties were involved. Rather, Zurich had attempted to sell Gruntal for two years. It is undisputed that several different entities entered into letters of intent to purchase some or all of the assets of Gruntal, but, for various reasons, withdrew those letters of intent. Ryan Beck had been one of many suitors negotiating with Gruntal in late 2001 and early 2002.

Moreover, Campbell has provided no evidence that Gruntal had knowledge of Campbell's claim and Gruntal's inability to pay it. Indeed, it is undisputed that Campbell filed his claim some five months after the Ryan Beck-Gruntal Agreement was finalized. Additionally, at the bankruptcy proceedings in October, 2002, the CEO of Gruntal testified that in the six month period following the Ryan Beck-Gruntal Agreement, Gruntal paid over $22 million to resolve disputes with its creditors, including customer arbitrations. A Disclosure Plan filed in the bankruptcy court by Gruntal in June, 2003, reports that Gruntal had another $8-10 million in liquid assets to distribute to its creditors. Furthermore, Gruntal did not retain control of the transferred assets. Finally, Campbell has come forth with no evidence that would demonstrate gross inadequacy of the consideration paid for the assets of Gruntal. It is undisputed that Gruntal paid over $6 million dollars at the closing, an addition $1.82 million in post-closing adjustments, assumed leasehold obligations aggregating $49 million (thereby relieving Gruntal of these obligations), assumed obligations amounting to $3.4 million for equipment and fixtures (thereby

14

relieving Gruntal of these obligations), and assumed annual personnel expenses of approximately $90 million. Campbell has not offered any evidence that the consideration was put beyond the reach of creditors. In sum, Campbell has not presented evidence from which a reasonable jury could find actual fraud under the clear and convincing standard of § 276, or even under a preponderance of the evidence standard. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (Clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions).

However, Campbell vigorously asserts that Ryan Beck did not pay "fair consideration" for the assets of Gruntal. He argues that by failing to do so, the Ryan Beck-Gruntal Agreement violated §§ 273,[8] 274,[9] and 275[10] of the New York Debtor and Creditor Law. Fair consideration, he maintains, is

---

[8] § 273 states:
> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

N.Y. Debt. & Cred. Law § 273 (McKinney 2003).

[9] § 274 states:
> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

N.Y. Debt. & Cred. Law § 274 (McKinney 2003).

[10] § 275 states:
> Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

N.Y. Debt. & Cred. Law § 275 (McKinney 2003).

15

also a question of fact. Campbell Opp. at 19, citing *Taub*, 504 N.Y.S.2d at 449. Specifically, *Taub* states that "what constitutes fair consideration is generally one of fact, to be determined under the circumstances of the particular case." *Id.; see also U.S. v. McCombs*, 30 F.3d 310, 326 (2d Cir. 1994) ("fair consideration [under N.Y. Debtor & Creditor Law § 272] must be determined upon the facts and circumstances of each case"). Fair consideration under the New York Debtor and Creditor Law requires that the value of the consideration be a fair exchange of value and that there be good faith on the part of the parties involved. *See McCombs*, 30 F.3d at 326 n.1. Finally, fair consideration does not require dollar-for-dollar equivalence; it simply must be an amount that is not "disproportionately small" as compared to the value of the assets purchased. *Lippe*, 249 F. Supp.2d at 377.

In support of his allegation that the consideration paid for Gruntal was not fair, Campbell points to the following: several other companies who bid for Gruntal did not exclude Gruntal's liabilities concerning customer complaints and arbitrations; other offers for Gruntal contained more cash (which would have been made available to Gruntal's creditors); and Ryan Beck's prior letter of intent (from November, 2001, which Gruntal subsequently rejected) offered to purchase "essentially the same assets" for more consideration than was ultimately paid in April, 2002. Campbell Opp. at 20, 22. Campbell also contends that the assets Ryan Beck acquired from Gruntal were worth "millions dollars more than what was paid by Ryan Beck," thus evidencing unfair consideration. As support for this contention, he points to the deposition of Ben Plotkin, CEO of Ryan Beck, wherein Plotkin testified that the GMS group, a wholly owned subsidiary of Gruntal that Ryan Beck acquired in the transaction had a liquidation value of somewhere between $6-18 million. Plotkin does not admit this proposition. Campbell also points to the yearly revenues generated by brokers and customer accounts acquired by Ryan Beck apparently as evidence of the value of the assets Ryan Beck purchased. Finally, Campbell contends that Ryan Beck realized a $24 million gain as a result of the transaction with Gruntal.

Despite the above assertions, Campbell has not offered any admissible evidence that the cash and assumed liabilities paid by Ryan Beck was inadequate consideration. He offers neither a valuation expert nor the testimony of any witness who has opined or admitted that the consideration paid was inadequate or unfair. Moreover, he has offered no admissible evidence as to what would constitute fair consideration. Campbell has not demonstrated how the offers made by other companies throughout 2001 and early 2002 constitute a reliable measure of fair value. Those offers never resulted in completed deals. Similarly, it is unclear how Ryan Beck's offer from November, 2001, is a reliable measure of the fair value of the conveyance in April, 2002. It is undisputed that Gruntal was losing millions of dollars each month and was "struggling to survive" by March and April of 2002. Moreover, the record does not contain any evidence that would support a finding that good faith was lacking in this transaction. Therefore, drawing all reasonable inferences in favor of Campbell, sufficient evidence does not exist to permit a reasonable jury to find the transaction was entered into fraudulently to escape Gruntal's obligations.

In sum, we conclude that Campbell has failed to demonstrate that any of the exceptions to the general rule against successor liability apply here. Thus, the general rule applies: a corporation that merely purchases the assets of another is not liable for the debts and liabilities of the seller. As such, Ryan Beck cannot be held liable for claims arising from Gruntal's dealings or transactions with Campbell and cannot be compelled to arbitrate Campbell's dispute with Gruntal.

Therefore, Ryan Beck has demonstrated actual success on the merits. Having met the other three requirements for injunctive relief as discussed in our November 26, 2002 opinion, Ryan Beck's success on the merits of its claim makes the issuance of a permanent injunction proper.

## CONCLUSION

For the foregoing reasons, Ryan Beck's motion for summary judgment is granted. For the above reasons and pursuant to Fed.R.Civ.P. 65, it is therefore ordered that the preliminary injunction issued on November 26, 2002, be made permanent. Campbell is permanently enjoined from pursuing NASD or other arbitration proceedings against Ryan Beck for claims arising from Campbell's dealings or transactions with Gruntal & Co., Inc. or for conduct alleged to have occurred prior to the April 26, 2002 Ryan Beck-Gruntal asset purchase agreement. Finally, we hold that Ryan Beck is entitled to a declaratory judgment that it is not a successor in interest to Gruntal. It is so ordered.

								_____
								MARVIN E. ASPEN
								United States District Judge

Dated 10/2/03